**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AVANZALIA SOLAR, S.L. and AVANZALIA PANAMA, S.A.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 20 C 5035** |
| **GOLDWIND USA, INC., d/b/a GOLDWIND AMERICAS,** | ) ) ) ) | |
| **Defendant.** | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Avanzalia Solar, S.L. and Avanzalia Panama, S.A. (Avanzalia) have sued Goldwind USA, Inc. (Goldwind) for tortious interference with prospective economic advantage and tortious interference with contract. Avanzalia Panama—the Panamanian affiliate of the Spanish energy company, Avanzalia Solar—invested several million dollars to construct a solar power plant in Panama with the intention of selling electricity to various customers there beginning in 2017. Avanzalia contends that Goldwind tortiously blocked access to a critical substation owned by its Panamanian affiliate, UEP I, making it impossible for Avanzalia to connect to the national power grid and sell electricity. Avanzalia contends that, as a result, it was unable to perform contractual obligations or obtain the benefit of its expectancies. Goldwind has moved for summary judgment on both of Avanzalia's claims. For the reasons set forth below,

the Court grants the motion.

## Background

The following facts are undisputed except where otherwise noted. Avanzalia Panama, S.A. is a Panamanian corporation that owns a 120-megawatt solar power plant in Panama. Avanzalia Panama is owned by Avanzalia Solar, S.L., a Spanish corporation that also invested in the construction of the power plant. Goldwind is a corporation organized under the laws of the State of Delaware, with its headquarters and principal place of business in Chicago. UEP I is a company located in Panama that, at times relevant to Avanzalia's complaint, owned an electrical substation in Panama known as the El Coco substation. For purposes of summary judgment only, Goldwind does not contest that it was operating as UEP I's alter-ego.

Panama has laws that establish the regulatory and institutional framework for the provision of electricity services in the country. These laws also govern access to substations by "market agents" such as Avanzalia. Empresa de Transmision Electrica, S.A. (ETESA) is the government-run utility company that manages the planning, maintenance, and expansion of the national grid. ETESA is responsible for issuing a "certificate of viability" to eligible entities seeking to connect to the grid. Entities seeking a certificate of viability are required to submit electrical studies showing the impact of their proposed connection to the grid, which ETESA then sends to the substation owner for comment before issuing a certificate of viability. Autoridad Nacional de los Servicios Publicos (ASEP) is the administrative agency that regulates public services including electricity. Under Panamanian law, ASEP is empowered to promulgate rules, manage compliance with regulations, impose sanctions (payable to the government), resolve

2

conflicts through arbitration, and issue orders and resolutions.  ASEP is also the entity responsible for issuing a "definitive license" to market agents wishing to build, operate, and generate electricity from power plants.  Avanzalia disputes ASEP's authority to resolve commercial disputes or to award damages.

In 2013, in connection with its solar plant project, Avanzalia consulted an electrical engineer, Alvin Ruiz, to advise it on the licensing requirements and electrical regulations in Panama.  By the end of 2014, Avanzalia had obtained what it believed to be all the necessary certificates and licenses needed to operate its solar plant.  These included a certificate of viability from ETESA confirming that Avanzalia could connect its solar plant to the national grid through the El Coco substation and a definitive license from ASEP to build and operate the plant.  Sometime around August 2015—the parties dispute exactly when—Avanzalia sought to negotiate an agreement to access the El Coco substation with its owner, Mr. Raphael Perez-Pire.  Goldwind does not dispute that to connect to the national grid and therefore sell electricity, Avanzalia first had to connect through the El Coco substation.

On August 27, 2015, Mr. Perez-Pire wrote to Avanzalia stating that an access contract could not be granted to Avanzalia because certain regulatory requirements had been violated.  He stated that ETESA had mistakenly issued Avanzalia a certificate of viability without *first* confirming that Avanzalia had successfully obtained an access agreement from UEP I to connect to its substation and sending the electrical studies to UEP I for comment.  It is undisputed that Avanzalia did not first approach UEP I about an access agreement before seeking a certificate of viability from ETESA or a license from ASEP.  Avanzalia maintains that it was not required to do so because it could not

be denied the right to connect if the substation had "remaining capacity" under the terms of the regulations, which ETESA concluded the substation had. Goldwind submits that the regulations state that a substation owner can reject access in the event of non-compliance with the requirements set forth in the electrical regulations. It is also undisputed that in connection with its 2013 certificate of viability request, ETESA did not provide UEP I with copies of any electrical studies that were performed by Avanzalia.

In September 2015, Salomon Behar, an attorney for UEP I, wrote an e-mail to Avanzalia. Behar stated that to move forward with executing an access agreement, Avanzalia needed to rectify the flawed process through which it received its certificate by providing UEP I with copies of the missing electrical studies.

On January 19, 2016, Avanzalia filed an administrative complaint with ASEP asking it to intervene in Avanzalia's dispute with UEP I. After several answers and replies were filed in response to the complaint, the parties engaged in a private hearing before ASEP on December 22, 2016. ASEP considered evidence submitted by both parties but heard no live testimony. The following day, UEP I requested the electrical studies from ETESA that had been provided by Avanzalia, and on December 29, 2016, ETESA sent UEP I the studies. On January 19, 2017, ASEP ordered Avanzalia to provide ASEP with the studies it had submitted to ETESA in 2014, which Avanzalia did. On February 13, 2017, ASEP sent the studies to UEP I for comment.

On March 14, 2017, UEP I filed another motion with ASEP contending that the electrical studies and the diagram provided by Avanzalia were outdated because they were based on a database from 2013 that did not include new solar and wind projects that came about later. UEP I argued that both a new set of studies and a new diagram

4

taking the new projects into consideration should be presented. For example, the single-line diagram submitted by Avanzalia to ETESA proposed to connect Avanzalia's solar project through a particular lane of the El Coco substation that had been reserved for the addition of two new UEP I power transformers. Avanzalia filed a reply with an expert report from its consulting engineer Ruiz disputing the need to update the studies or diagram.

On June 5, 2017, ASEP issued an order "Resolving Arbitration brought by Avanzalia Panama against UEP I." Pl.'s Resp. to Def.'s Stmt. of Facts, Ex. 32. The order required Avanzalia to submit updated studies and an updated diagram to UEP I along with a renewed request for substation access. The order further required UEP I to grant Avanzalia the access contract once it had satisfactorily complied with the transmission regulations. The June 5 order was reversed on July 26, 2017 after Avanzalia requested reconsideration, but ASEP's ultimate position was unchanged. The July 26 order merely modified the June 5 order by setting a deadline for the parties to comply with their respective directives.

In its July 26 order, ASEP held that a breach of the transmission regulations had occurred because Avanzalia had not, before seeking a certificate of viability from ETESA, sent UEP I the required studies for comments or objections and obtained an access agreement with UEP I. ASEP also stated that substation owners could *only* refuse a request for access—as UEP I did—in the event of a "breach of the requirements set out in this Regulation and/or the Operating Regulations." *Id.*, Ex. 29 at 12. ASEP further noted that it was only by virtue of the ASEP proceeding that UEP I was able to submit its objections and comments with respect to the studies submitted by

Avanzalia to ETESA and that it was therefore "necessary to correct the process to grant the feasibility of access made by [ETESA]." *Id*. at 14. ASEP also held that "it would be irresponsible" on its part to issue an order requiring UEP I to sign an access agreement without Avanzalia having taken into consideration the technical proposals that UEP I raised during arbitration. *Id*.

After further objections from both parties, ASEP issued its final order in October 2017. ASEP ordered: (1) UEP I to promptly send Avanzalia the information it needed about the new projects so that it could update the studies and the diagram; (2) Avanzalia to complete those updates within 30 business days after the necessary information was provided by UEP I; and (3) UEP I to proceed to sign an access agreement with Avanzalia once the first two of these steps were complete. On December 29, 2017, Avanzalia and UEP I executed an access agreement.

Avanzalia alleges that once the access agreement was in place, UEP I engaged in further delay tactics from 2017 through its sale of the substation in May 2020 that prevented Avanzalia from designing and building its physical connection to the substation ("post-agreement conduct"). There are therefore two periods of alleged wrongdoing by UEP I acting as Goldwind's alter-ego: pre-access agreement, from August 2015 to December 29, 2017, and post-access agreement, from December 2017 on. The post-agreement conduct Avanzalia describes boils down to slow-walking the issuance of the necessary construction contracts (known as "supervision contracts") and stalling the construction by refusing to timely approve Avanzalia's designs and withholding information needed to complete them. Goldwind does not address these allegations substantively. Instead, it argues that according to the terms of the access

6

agreement, any allegations regarding post-agreement conduct—which Avanzalia describes as breaches of the parties' agreement—must be adjudicated before ASEP prior to being litigated in court.

With the expectation of having the solar plant up and running by 2017, Avanzalia executed power purchase agreements with five entities: Tova S.A., Nuevos Hoteles de Panama, Tamek, S.A., Invesiones Parna, S.A., and Kadima, S.A. The first of those agreements was executed on December 21, 2016 (Tova), and the last was executed on July 26, 2018 (Kadima). Avanzalia's tortious interference with contract claim is based in part on its contention that Goldwind's delays rendered it impossible for Avanzalia to perform these contracts. Avanzalia also claims it was prevented from selling its electricity on the open spot market, where all electricity not being sold to private clients is sold. The future expectancies that Avanzalia contends Goldwind interfered with are sales to private third parties[1] that it contends would have purchased electricity from Avanzalia but for Goldwind's interference, sales on the Panamanian open spot market, and an offer made by Fisterra Energy S.L.U. in January 2016 to purchase the solar project.

Other than the PPA with Tova—which was executed on December 21, 2016—

_____

[1] In their respective Answers to Goldwind's Interrogatory No. 2, both Avanzalia Solar and Avanzalia Panama name only Hospital San Fernando when describing "potential clients that wished to enter into PPAs with [Avanzalia]." Pl.'s Am. Resp. and Obj. to Def.'s First Set of Interrog. at 6-7. In footnote 5 of their response to Goldwind's motion for summary judgment, Avanzalia names another nineteen allegedly prospective customers. Goldwind disputes that any of these prospects can be considered actionable lost expectancies because Avanzalia did not provide definite, competent evidence that any of these potential customers actually contemplated entering a business relationship with Avanzalia.

and the PPA with Nuevos Hoteles de Panama—which was executed on January 10, 2017—the other three PPAs that Avanzalia contends Goldwind interfered with were executed post-access agreement. Thus only Goldwind's alleged interference with the Tova and Nuevos Hoteles de Panama PPAs form part of Avanzalia's pre-access agreement allegations. Also included in the pre-access agreement allegations is Goldwind's interference with Avanzalia's "contract" with would-be open spot market customers—as this allegation is not associated with a particular date—and the offer made by Fisterra Energy S.L.U. in January 2016 to purchase the solar project. The post-access agreement allegations therefore include Goldwind's alleged interference with: (1) Avanzalia's existing PPAs with Tamek, S.A., Invesiones Parna, S.A., and Kadima, S.A.; and (2) potential sales that were not associated with a particular date, such as sales to prospective private customers and sales to customers purchasing electricity on the open spot market.

In May 2020, Avanzalia was finally able to connect its plant to the El Coco substation after UEP I sold the substation to a United States energy group named AES. Avanzalia began selling electricity from the plant in January 2021.

### Discussion

To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The non-moving party must identify "specific,

admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).

**A.    Motion to strike the affidavits of Selva Quintero and Dennis Moreno**

As a threshold matter, the Court addresses Avanzalia's motion to strike "portions of Defendant's two supplemental expert reports that render new opinions." Pl.'s Resp. at 30. Avanzalia contends that Goldwind has improperly submitted supplemental reports from two experts, Selva Quintero and Dennis Moreno, that are new and untimely under Federal Rule of Civil Procedure Rule 26. The Court overrules this contention.

As experts on the law of a foreign nation, Quintero and Moreno are subject to Rule 44.1, not Rule 26. Under Rule 44.1, "the determination of foreign law is an issue of law for the court . . . [and] the court may consider any relevant material or source, whether or not submitted by a party *or otherwise admissible under the Federal Rules of Evidence* . . . [and has the] prerogative to engage in its own research and consider any relevant material thus found." *Pittway Corp. v. United States*, 88 F.3d 501, 504 (7th Cir. 1996) (emphasis added); *see also*, *Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473, 477 (7th Cir. 2000) (in answering questions involving the law of a foreign nation "a federal court is not limited to the consideration of evidence that would be admissible under the Federal Rules of Evidence"). As this case involves questions of foreign law, Quintero and Moreno's opinions are appropriate sources for the Court to consider.

**B.    Collateral estoppel and comity**

9

Goldwind contends that Avanzalia's pre-access agreement allegations—namely any tortious interference via unjustified delays that allegedly occurred between August 2015 and December 29, 2017—have already been resolved by ASEP and that the Court should accept ASEP's determination both as a matter of comity and pursuant to the doctrine of issue preclusion. More specifically, the ASEP finding that Goldwind contends is binding on Avanzalia is that Goldwind was within its rights—in other words, not unjustified—to delay granting an access contract to Avanzalia until Avanzalia cured the flawed process through which it obtained its licenses and certificates. Avanzalia disagrees, distinguishing the issues decided by ASEP from those before this Court and also challenging the sufficiency of the process involved.

## 1.    Comity

The doctrine of international comity requires courts of one nation to avoid interfering with courts of another. *Matter of Rimsat, Ltd.*, 98 F.3d 956, 963 (7th Cir.1996). Unless a foreign judgment offends United States public policy, United States courts "should generally give preclusive effect to the foreign court's finding as a matter of comity." *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011). Here, the Court agrees with Goldwind that the United States public policy likely has very little interest, if any, in the innerworkings of Panamanian energy regulation.

The Court may also consider whether the foreign forum ensured procedural fairness and whether there was prejudice or fraud in the proceeding. *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). Avanzalia contends that the ASEP proceeding afforded it limited procedural rights, was tainted by fraud committed by UEP I, and did not involve all parties to this case. There is no support in the record for the first two contentions,

10

and the last is irrelevant on this question.

The ASEP proceeding lasted from January 2016 to October 2017. The parties had ample opportunity over approximately twenty-one months to complete service of process, develop their respective cases, submit documentary evidence, file motions, and even appeal ASEP's resolutions. There is no basis to consider these extended proceedings to have been procedurally unfair. Avanzalia's contention that UEP I made fraudulent representations to ASEP during the proceeding is similarly unfounded. Avanzalia contends that UEP must have lied to ASEP about the impact the incoming wind and solar projects would have on Avanzalia's plans because ETESA concluded that those projects would not have any adverse effect on the electrical system. But the fact that ETESA ultimately concluded that the incoming projects would not adversely affect the system does not obviate the need for the electrical studies that were required by law. Nor does ETESA's conclusion amount to a determination that UEP I's contentions about the new projects were fraudulent. Finally, Avanzalia's contention regarding the non-mutuality of the parties is also unavailing, as the Court is not aware of any such requirement in the context of comity.

If the foreign proceeding was full and fair, as it was here, then "the merits of the case should not, in an action brought in [the United States] upon the judgment, be tried afresh . . . upon the mere assertion of [a] party that the judgment was erroneous in law or in fact." *Hilton*, 159 U.S. at 164. Thus, as a matter of comity, the Court sees no reason to question, or reject the adoption of, ASEP's rulings in the parties' underlying administrative proceeding.

## 2. Issue preclusion

11

There is no settled rule in the Seventh Circuit regarding whose principles of issue preclusion apply in determining the preclusive effect of a foreign judgment: those of the foreign nation or those of the United States. *See Kashamu*, 656 F.3d at 683 (noting that under principles of international comity, United States courts should typically apply the foreign court's concept of issue preclusion in deciding what weight to give that court's ruling); *id*. at 685 ("So while in the absence of agreement to apply U.S. law we might apply the foreign law of collateral estoppel in this case (the 'might' reflecting the doubt we expressed earlier), we shall bow to the parties' tacit agreement and decide the case under federal common law"). Goldwind contends, and the Court agrees, that the outcome here is the same regardless of whether Panamanian or Illinois law applies.

### a. Panamanian law

Quintero's declaration—which the Court finds relevant for the reasons previously discussed—provides helpful guidance on Panamanian law regarding claim and issue preclusion. According to Quintero, resolutions such as those issued by ASEP are "administrative acts" that "enjoy legal stability" and are "preclusive and binding" under Panamanian law, specifically Article 201 of Law 38 of July 31, 2000. Def.'s Stmt. of Facts, Ex. 4 at 4. Article 201 states that an "[a]dministrative act duly motivated and based on law, which decides the merits of a petition, *puts an end to an instance or decides an incident* or appeal in the governmental process." *Id*. (emphasis added). Article 46 of Law 38 states that orders and administrative acts by entities such as ASEP "'have immediate binding force, and shall be applied as long as their effects are not suspended, are not declared contrary to the Political Constitution, the law, or the general; regulations by the competent courts.'" *Id*. at 5 (quoting Article 46 of Law 38 of

12

2000).  A principle referred to as the "presumption of legality" functions in the same way as issue preclusion in that it prevents an administrative act from being disregarded or re-litigated, and the administrative act has "binding force and effect in any other proceeding initiated by the parties." *Id*. at 8.  Because Avanzalia did not appeal ASEP's decision or file new claims against UEP I, according to Quintero, ASEP's decision has preclusive effect in Panama.

> **b.    Illinois law**

Both parties make arguments applying Illinois law to the question of whether ASEP's decisions have preclusive effect on this dispute.  Where the parties agree on the law that governs a dispute, and there is at least a reasonable relation between the dispute and the forum whose law has been selected by the parties, a court may forego an independent analysis of the choice-of-law issue and apply the parties' choice.  *Harter v. Iowa Grain Co.*, 220 F.3d 544, 559 n.13 (7th Cir. 2000).  In this case, the parties appear to agree that Illinois law applies, and Goldwind directed UEP I from its office in Chicago, Illinois, which indicates a reasonable relation between Illinois and the dispute. The Court will therefore apply Illinois law to the parties' issue preclusion dispute.

Under Illinois law, the doctrine of issue preclusion applies when:  (1) the issue decided in the prior adjudication is identical to the issue in the current action; (2) the party against which preclusion is asserted was a party or in privity with a party to the prior case; and (3) there was a final judgment on the merits in the prior action.  *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 258, N.E.2d 471, 478 (2001).  Additionally, the party against whom issue preclusion is asserted must actually have litigated the issue in the first proceeding, and the issue must have been necessary to the decision in the first

proceeding. *Am. Fam. Mut. Ins. Co. v. Savickas*, 193 Ill. 2d 378, 387, 739 N.E.2d 445, 451 (2000). Issue preclusion applies equally to the decisions of administrative agencies if the agency was acting in an adjudicatory, judicial, or quasi-judicial capacity and the disputed issue is identical to the issue presented in the new claim. *Gallaher v. Hasbrouk*, 2013 IL App (1st) 122969, ¶ 21, 3 N.E.3d 913, 923.

### i. ASEP acting in an adjudicatory or quasi-judiciary capacity

In a heading, Avanzalia refers to the ASEP proceeding as "non-judicial," but it does not elaborate on that characterization. Pl.'s Resp. at 5. The Court assumes from this that Avanzalia is suggesting that because ASEP is an administrative agency, its proceedings are "non-judicial" and thus its findings do not carry preclusive effect. This contention lacks merit. The record is clear that ASEP was acting in an adjudicative capacity. Both parties were represented by counsel, introduced evidence, filed motions, made objections, and took part in a hearing. ASEP made numerous written findings of fact and conclusions of law. The Court concludes that this requirement for issue preclusion is met.

### ii. Identical issues actually litigated and necessary to ASEP decision

The ASEP proceeding involved the same factual allegations as those before this Court, and the parties actually litigated UEP I's alleged misconduct. Avanzalia attempts to draw a distinction between the issues, contending that "ASEP only decided the very narrow regulatory issue of whether UEP I had to grant Avanzalia Panama an access contract." Pl.'s Resp. at 13. But the fact that Avanzalia's claims here fall under the umbrella of tort law rather than administrative law does not negate the fact that the underlying issues are identical, and that the issue to be determined here was necessary

14

to ASEP's decision.

To prevail on its claim for tortious interference with an expectancy, Avanzalia must show: "(1) [a] reasonable expectancy of entering into a valid business relationship; (2) the other party's knowledge of the expectancy; (3) the other party's intentional and unjustifiable interference that induced or caused a breach or termination of the expectancy; and (4) damage to the complaining party resulting from the other party's conduct." *F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 800 (7th Cir. 2007). To prevail on its tortious interference with contract claim, Avanzalia must show: "(1) the existence of a valid and enforceable contract between the plaintiff and another party; (2) that the defendant was aware of the contractual relationship; (3) an intentional and unjustified inducement of a breach of the contract by the defendant; (4) the subsequent breach of the contract by the other party, caused by the defendant's inducement; and (5) damages." *Williams v. Shell Oil Co.*, 18 F.3d 396, 402 (7th Cir. 1994). Thus to prevail on either claim, Avanzalia would have to establish that UEP I's delays were intentional and unjustified.

The proceeding before ASEP involved the same complaint made here, namely, that UEP I unjustifiably delayed signing an access agreement with Avanzalia. ASEP's determination of whether UEP I was required to grant Avanzalia an access contract was predicated on its determination of whether UEP I's reasons for refusing the grant the contract were justified. Put another way, determination of whether UEP I's delays were wrongful was necessary to ASEP's decision on whether UEP I was required to immediately grant Avanzalia a contract. In summarizing the parties' allegations and requests for relief in its July 26 Order, ASEP made numerous mentions of UEP I's

15

allegedly wrongful delay tactics. Among other points, it noted the contention that ". . . *through dilatory measures*, [UEP I] prevented the admission of the arbitration request from becoming definitive, having elapsed more than seven (7) months." Pl.'s Resp. to Def.'s Stmt. of Facts, Ex. 30 at 5 (emphasis added). ASEP also provided the following summaries of Avanzalia's contentions:

> They allege that *the main reason for the lack of progress in the development of the Penonomé Photovoltaic Solar Plant project, is the refusal 'contra lege' of the company UEP PENONOMÉ I, S.A. to comply with its obligation to provide access to the Substation El Coco*, who committed to providing it if AVANZALIA PANAMÁ, S.A. complied with the requirements that the regulations demand, which they state they have done to the fullest; added to the above, *they state that it seems that UEP PENONOMÉ I, S.A. took on the task of creating unjustified delays*, requesting the repetition of regulatory requirements with which they had already complied, excluding the new request for access, which they consider that since it was not requested by any of the parties, the order in the challenged Resolution exceeds the legal powers of the Regulatory Authority in accordance with the applicable rules of administrative procedure.

*Id*. at 7 (emphasis added).

> They insist on the vital importance of defining the connection of the project to the El Coco Substation, which is why they are concerned about the additional obstacle imposed on the company AVANZALIA PANAMÁ, S.A. through the appealed Resolution, *especially in view of the dilatory behavior that UEP PENONOMÉ I, S.A. has demonstrated at all times*.

*Id*. (emphasis added).

> *They state that they are not responsible for any kind of delay, especially because AVANZALIA PANAMÁ, S.A., could have delivered the connection studies to them a long time ago, instead of doing it in the arbitration*. As a result, the documentation and information related to the connection of their plant to the El Coco Substation suffers from errors that may threaten the safety of the system.

*Id*. at 10 (emphasis added).

> Moreover, in its ruling, ASEP held that UEP I was "entitled to request that

16

[Avanzalia update the electrical studies and diagram] prior to signing the access agreement." *Id*. at 13. It also held that UEP I was within its rights to deny Avanzalia an access agreement because it was not required to do so until Avanzalia cured the process by which it obtained its licenses and certificates. ASEP further held that it would be "irresponsible" to require UEP I to immediately execute an access agreement with Avanzalia before the process deficiencies had been cured. *Id*.

In sum, the issues litigated in both proceedings are identical, and the findings relied upon by Goldwind here were necessary to ASEP's determination. Because ASEP already determined that Goldwind's pre-access agreement delays were justified, any finding made here that the delays were unjustified would be contrary to ASEP's determination.

### iii. Privity

"'Privity' refers to a cluster of relationships under which the preclusive effects of a judgment extend beyond a party to the original action and apply to persons having specified relationships to that party." *State Farm Fire & Cas. Co. v. John J. Rickhoff Sheet Metal Co.*, 394 Ill. App. 3d 548, 559, 914 N.E.2d 577, 589 (2009) (quoting Restatement (Second) of Judgments, Introduction, at 1 (1982)). "Under Illinois law, a party is in privity with another, for purposes of issue preclusion, if his own interests are so closely aligned to prior party's interests that the party was his virtual representative." *McNealy v. Caterpillar, Inc.*, 139 F.3d 1113 (7th Cir. 1998). Avanzalia contends that ASEP's resolution is not preclusive because Avanzalia Solar was not a party to the ASEP proceeding. In doing so, it attempts to draw a line between Avanzalia Panama and Avanzalia Solar for purposes of comity and issue preclusion only. That line

17

ironically disappears for the remaining issues, which necessarily depend on a finding that Avanzalia Solar shares a unity of interest with Avanzalia Panama. This logic is inconsistent. Not only is Avanzalia Solar the sole shareholder of Avanzalia Panama, it also helped finance and develop the solar plant project at issue. And Avanzalia discusses at length in section VII of its response how Avanzalia Panama, as a subsidiary of Avanzalia Solar, acted at all times for the benefit of its parent. *Am. Freedom Ins. Co. v. Garcia*, 2021 IL App (1st) 200231, ¶ 44, 192 N.E.3d 649, 660 ("Privity generally exists when parties adequately represent the same legal interests."). The Court finds that Avanzalia Panama acted in Avanzalia Solar's interest, and as its "virtual representative," when it brought this dispute to ASEP with the goal of obtaining an access contract that would allow the project to move forward. The Court therefore concludes that Avanzalia Solar is in privity with Avanzalia Panama such that issue preclusion can be asserted against Avanzalia Solar here.

### iv. Final judgment on the merits

Neither party addresses the final requirement in an issue preclusion analysis. The Court takes from this that Avanzalia does not dispute that ASEP's decision was both final and on the merits. That aside, the declaration of Quintero, an expert in Panamanian law, states that ASEP's decision became final after Avanzalia's deadlines for appeal passed. Moreover, ASEP's resolution constitutes a decision that concerns "the rights and liabilities of the parties based on ultimate facts or facts disclosed by pleadings, evidence, or both . . . ." *A.W. Wendell and Sons, Inc. v. Qazi*, 254 Ill. App. 3d 97, 108, 626 N.E.2d 280, 289 (1993). Once ASEP issued its final resolution in October 2017, all that remained was for both parties to comply with it. The Court concludes that

ASEP's resolution was final and on the merits.

For these reasons, the doctrine of issue preclusion—as defined under both Panamanian and Illinois law—bars Avanzalia from relitigating the wrongfulness of Goldwind's pre-access agreement conduct in the instant case. ASEP's determination that Goldwind's pre-December 2017 delays in executing a substation access agreement with Avanzalia were justified is binding in this case.

## B.    "Exhaustion" of administrative remedies

The parties appear to agree that issue preclusion pertains only to the claims relating to Goldwind's pre-access agreement conduct. The Court therefore turns to the question of whether Goldwind's post-access agreement conduct constitutes tortious interference with contract or expectancy. Goldwind contends that any disputes related to its post-access agreement conduct are required to be brought before ASEP under the dispute resolution clause of the parties' agreement, which states in relevant part:

> In the event that there is a breach by UEPI . . . THE USER shall notify UEPI, specifying the nature of the breach. UEPI shall have a period of thirty (30) days from said written notification to remedy the breach in question. In the event that UEPI's breach is not remedied within the indicated term, THE USER may, *after exhausting the instances provided for in clause 15 of this Contract and complying with the procedures of the case against ASEP*, take the following actions . . . .

Pl.'s Resp. to Def.'s Stmt. of Facts at 58 (emphasis added). The "instances provided for in clause 15" include direct negotiation between the parties and, if direct negotiation is unsuccessful, arbitration before ASEP. *Id*. at 59.

Goldwind refers to this as Avanzalia's obligation to "exhaust" Panamanian administrative remedies prior to proceeding in court. Avanzalia contends that this clause of the parties' agreement does not apply to Avanzalia Solar or Goldwind because

19

they are not signatories to the contract and because ASEP has no jurisdiction over Goldwind. Avanzalia also contends that this defense—which it characterizes as a contention that this aspect of the claim is subject to arbitration—has been waived by Goldwind.[2] The Court agrees with the latter contention.

To find that Goldwind waived its right to compel arbitration before ASEP, the Court "must determine that, considering the totality of the circumstances, [Goldwind] acted inconsistently with the right to arbitrate." *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011). When a party chooses to proceed in a judicial forum, there is a rebuttable presumption that the party has waived its right to arbitrate. *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.* 50 F.3d 388, 390 (7th Cir. 1995).

Goldwind did raise this defense in its answer, at page 17. Goldwind did not, however, file a motion seeking to compel arbitration of any part of Avanzalia's claims based on the dispute resolution clause. Instead, it participated fully in discovery and litigated this case in court for approximately two and a half years. In other words, "[i]t wanted to play heads I win, tails you lose." *Cabinetree*, 50 F.3d at 391. Goldwind's litigation of this case on the merits is fundamentally inconsistent with its contention, in the motion for summary judgment, that this aspect of the dispute should be decided by

---

[2] Despite Goldwind's objections to this characterization in its reply, it uses the term "arbitrate" to describe ASEP's dispute resolution powers in paragraph 8 of the affirmative defense portion of its answer. Def.'s Answer at 17. ASEP itself also describes the parties' prior proceeding as an arbitration in its numerous resolutions. The dispute resolution clause at issue similarly describes ASEP proceedings as an arbitration.

an arbitrator in Panama.  The Court therefore finds that Goldwind has not rebutted the presumption that it waived its right to insist on arbitration.

## C.  Tortious interference post-agreement

Due to issue preclusion, Avanzalia cannot maintain any claims based on Goldwind's pre-access agreement conduct.  The balance of Avanzalia's claims consists of post-access agreement (post-December 2017) conduct by Goldwind.  Avanzalia describes several categories of allegedly wrongful post-agreement conduct on UEP I's part:  (1) failing to timely provide a complete set of schematics necessary for Avanzalia to accurately design its interconnection; (2) failing to timely comment on and approve Avanzalia's designs or asking that immaterial changes be made to them; (3) delaying the issuance of supervision contracts; and (4) withholding approval for work or for the use of certain materials.  The expectancies that Avanzalia contends Goldwind interfered with via these delays involved the PPAs Avanzalia had executed with Tamek, Invesiones Parna, and Kadima, as well as potential sales to prospective private customers and those purchasing electricity on the open spot market.

For both tortious interference with an expectancy or contract, Goldwind challenges Avanzalia's evidence on all but the last requirement—proof of damages. Because Avanzalia's failure to show the existence of a factual dispute on any one of the elements of its claims is dispositive, the Court will begin its discussion with the element that ultimately entitles Goldwind to summary judgment.

### 1.  Conduct directed at a third party

Illinois law regarding intentional interference with an expectancy or with a contract requires proof that the defendant's actions were directed toward a third party.

21

*See McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 686 (7th Cir. 2014) (without any allegedly improper action directed to the relevant third party, a tortious interference with economic expectancy claim fails); *George A. Fuller Co. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983) ("Under Illinois law, liability for tortious interference [with contract] may only be premised on acts immediately directed at a third party which cause that party to breach its contract with the plaintiff."). This Court has previously held a plaintiff satisfies this if it shows that the defendant directed action at someone other than the plaintiff—regardless of whether that person is party to the contract or expectancy—with the intention to make it impossible for the plaintiff to obtain the benefit of its contract or expectancy. *JamSports & Ent., LLC v. Paradama Prods., Inc.*, 360 F. Supp. 2d 905, 906 (N.D. Ill. 2005). Central to the Court's holding in *JamSports* was section 767 of the Restatement (Second) of Torts. This provision indicates (using the example of tortious interference with contract) that actions directed to someone other than the second contracting party may be considered tortious if the actor's primary purpose was to interfere with the plaintiff's obligations to the other contracting party. Restatement (Second) of Torts § 767 (1979 & Supp. 2004).[3]

---

[3] "If, however, A induces B to sell certain goods to him and thereby causes him not to perform his contract to supply the goods to C, this may also have the effect of preventing C from performing his contractual obligations to supply them to D and E. C's failure to perform his contracts is a much more indirect and remote consequence of A's conduct than B's breach of his contract with C, even assuming that A was aware of all of the contractual obligations and the interference can be called intentional. This remoteness conduces toward a finding that the interference was not improper. The weight of this factor, however, may be controverted by the factor of motive if it was the actor's primary purpose to interfere with C's obligation to D and E." *JamSports*, 360 F. Supp. 2d at 907 (quoiting Restatement (Second) of Torts § 767 (1979 & Supp.2004) (emphasis added).

Avanzalia contends that, under the Court's logic in *JamSports* and other similar Illinois cases,[4] the fact that Goldwind's conduct rendered Avanzalia's performance impossible is sufficient to support the "directed toward" requirement for both tortious interference claims.  But Avanzalia has not offered evidence that would support a finding that Goldwind directed its conduct at *any* entity other than Avanzalia itself. Goldwind is claimed to have delayed the issuance of supervision contracts, needlessly slowed down Avanzalia's design process, and otherwise blocked progress on construction.  This was all conduct directed at Avanzalia.  If conduct that is solely directed at a plaintiff were to serve as the basis for tortious interference, then every claim involving breach of contract or failure to enter into a contract could end up as a tort claim.  Illinois law does not support this.

Avanzalia contends that Goldwind directed its conduct at ETESA because the refusal (by Goldwind's alter ego UEP I) to approve Avanzalia's plans prevented ETESA from granting Avanzalia access to the national grid.  To the extent that Avanzalia is referring to pre-agreement conduct by Goldwind, that issue is precluded by ASEP's findings, as previously discussed.  With regard to post-agreement conduct by Goldwind, the chain of events Avanzalia describes involve conduct *directed at Avanzalia* that merely impacted its agreement with ETESA.  Avanzalia offers no evidence that would permit a finding that Goldwind/UEP I targeted conduct at ETESA itself, let alone that a

---

[4] *Scholwin v. Johnson*, 147 Ill. App. 3d 598, 608, 498 N.E.2d 249, 256 (1986); *Schuler v. Abbott Labs.*, 265 Ill. App. 3d 991, 994–995, 639 N.E.2d 144, 147 (1993); *HPI Healthcare Svcs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154–55, 545 N.E.2d 672, 676 (1989).

23

breach occurred.  Pl.'s Resp. at 21 ("The ETESA Contract explicitly provided that ETESA *would be in breach if* ETESA did not permit access to the grid without a justified technical reason.") (emphasis added).

For these reasons, Avanzalia has failed to offer evidence from which a reasonable jury could find that Goldwind directed its allegedly wrongful conduct at someone other than Avanzalia with the intention of making it impossible for Avanzalia to enjoy the benefit of its contract or expectancy.  Because Avanzalia's claims with respect to post-agreement conduct fail on this basis, the Court need not address Goldwind's contentions regarding the remaining elements of Avanzalia's claims.

### Conclusion

For the foregoing reasons, the Court grants the defendant's motion for summary judgment [126] and directs the Clerk to enter judgment in favor of defendant Goldwind USA, Inc. and against plaintiffs Avanzalia Solar, S.L. and Avanzalia Panama, S.A..

MATTHEW F. KENNELLY
United States District Judge

Date:  January 19, 2023