**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AVANZALIA SOLAR, S.L. and** | ) | |
| **AVANZALIA PANAMA, S.A.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 20 C 5035** |
| | ) | |
| **GOLDWIND USA, INC., d/b/a** | ) | |
| **GOLDWIND AMERICAS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Avanzalia Solar, S.L. and Avanzalia Panama, S.A. sued Goldwind USA, Inc. for tortious interference with prospective economic advantage and tortious interference with contract. The Court granted summary judgment to Goldwind on both claims. Avanzalia appealed. The Seventh Circuit affirmed on the prospective economic advantage claim and remanded the case for further consideration of an alternate theory on the interference with contract claim. *See Avanzalia Solar, S.L. v. Goldwind USA, Inc.*, 146 F.4th 553 (7th Cir. 2025). On remand, the Court denied Goldwind's motion for summary judgment on the tortious interference with contract claim. The case is now set for trial in April 2026.

In advance of the trial and under Federal Rule of Procedure 44.1, the Court held a two-day hearing regarding a question of foreign law implicated by Avanzalia's remaining claim: whether certain provisions of the Master Agreement and Undertaking between Goldwind and its Panamanian affiliates violate the free access

principle of Panamanian law. The Court holds that section 7.2 of the Master Agreement does not violate the free access principle, but section 2.3 of the Undertaking is inconsistent with the free access principle and any actions taken by Goldwind based on that provision would violate the free access principle. A jury must assess whether Goldwind took such actions and must also decide the remaining elements of Avanzalia's claim.

## Background

### A.     Factual background

Avanzalia Panama is a Panamanian corporation that owns a solar power plant in Panama. Avanzalia Solar, a Spanish energy company, owns Avanzalia Panama and invested in its solar power plant. Goldwind is a Delaware corporation with its headquarters and principal place of business in Chicago. Goldwind manufactures wind turbines. Goldwind and Unión Eólica Panameña (UEP) developed the 336.8 MW Penonomé Wind Project, a Panamanian wind farm employing Goldwind's turbines that included the El Coco Substation, a facility connecting the electricity produced by the wind farm to the national grid. The project was divided into phases with a different UEP entity (UEP, UEP I, and UEP II) responsible for each phase. UEP I is Goldwind's Panamanian alter ego.

Empresa de Transmision Electrica, S.A. (ETESA) is a government-run transmission company that maintains and manages the Panamanian national grid. ETESA must issue a certificate of viability before an entity may connect to the national grid. Autoridad Nacional de los Servicios Publicos (ASEP) is the governmental agency that regulates electricity and other public services in Panama. ASEP issues

definitive licenses to entities that wish to build, operate, and generate electricity from power plants.

In 2013, the three UEP entities and Goldwind entered into a contract, the Master Agreement. Section 7.2 of the Agreement provided:

> … the Company [UEP] shall not grant access to the Substation and to the current right under the Interconnection Agreement (as defined in the Credit Agreement) to interconnect up to 281.8MW (ie. the remaining interconnection capacity after deducting the 55MW of Phase I from the 336.8 MW total interconnection capacity) to any other market agent . . . to the extent that such access affects or may affect Phase II or the Remainder's capacity to connect to the energy grid and deliver its energy through the Shared Facilities.

Master Agreement § 7.2. The Court addresses this provision below.

In 2014, a new investor took over UEP II, and the same parties adopted the Undertaking Regarding Shared Assets and Interconnection. It contained a similar provision: "[N]one of the Parties nor the Facilities Company shall grant access to the El Coco Substation, and UEP I shall not transfer its Excess Rights other than as contemplated by Section 2.2 to any other than each owner of the Projects." Undertaking § 2.3. The Court will also address this provision below.

The Undertaking remained binding on most of the parties until Goldwind sold the El Coco Substation in 2020. *See* Pl.'s Mem. of L. at 2 n.1.

In 2013, Avanzalia entered the Panamanian energy market to build solar farms. It sought a connection to the El Coco Substation, through which the energy produced on its solar farms could reach consumers. UEP I denied Avanzalia access to the substation. Avanzalia filed a complaint with ASEP. ASEP issued several orders, recognizing UEP I's argument that Avanzalia had submitted outdated electrical studies and an outdated diagram to ETESA in violation of the transmission regulations,

3

requiring Avanzalia to submit updated versions to UEP I along with a renewed request for substation access, and requiring UEP I to grant the access request once Avanzalia had complied with the transmission regulations. In 2017, Avanzalia and UEP I executed an agreement allowing Avanzalia to access the El Coco Substation. Avanzalia alleges that UEP I then engaged in further misconduct by delaying the issuance of construction contracts and stalling construction.

Avanzalia expected to have its plant operational in 2017 and executed power purchase agreements with five entities: Tova S.A., Nuevos Hoteles de Panama, Tamek, S.A., Invesiones Parna, S.A., and Kadima, S.A. In June 2019, ETESA issued a certificate of viability to Avanzalia. Avanzalia claims that the purposes of this agreement and its five power purchase agreements were thwarted by the misconduct of Goldwind (via UEP I). Without a connection to the El Coco Substation, Avanzalia could not access the national grid to perform under its agreement with ETESA or its power purchase agreements.

In May 2020, after UEP I sold the El Coco Substation, Avanzalia finally connected to the substation. It began selling electricity from its plant in January 2021.

**B. Procedural history**

Avanzalia sued Goldwind for tortious interference with prospective economic advantage and with contract. As indicated earlier, Goldwind moved for summary judgment, and the Court granted Goldwind's motion. *See Avanzalia Solar, S.L. v. Goldwind USA, Inc.*, No. 20 C 5035, 2023 WL 319135, at *1 (N.D. Ill. Jan. 19, 2023). On appeal, the Seventh Circuit affirmed the Court's decision in part but remanded for consideration of a second theory of tortious interference with contract arising from

4

Restatement (Second) of Torts § 766A that the Court had failed to address.  *Avanzalia Solar*, 146 F.4th at 565–66.  The Seventh Circuit directed the Court to address that theory with respect to the June 2019 ETESA contract and the five power purchase agreements.  *Id.* at 566.

A tortious interference claim under section 766A has four elements that the plaintiff must establish:  (1) it had a valid and enforceable contract with another party; 2) the defendant was aware of the contractual relationship; 3) the defendant intentionally and unjustifiably prevented the plaintiff from performing the contract; and 4) the plaintiff was damaged as a result.  *See Scholwin v. Johnson*, 147 Ill. App. 3d 598, 607–08, 498 N.E.2d 249, 255–26 (1986); *see also* Restatement (Second) of Torts § 766A (1979).  On remand, the Court denied Goldwind's motion for summary judgment.  *Avanzalia Solar, S.L. v. Goldwind USA, Inc.*, No. 20 C 5035, 2025 WL 2972720, at *4–5 (N.D. Ill. Oct. 21, 2025).  The Court held that Goldwind failed to establish the absence of a genuine dispute of material fact on any one of the elements of a Section 766A tortious interference with contract claim with respect to both the ETESA agreement and each of the five purchase agreements.

C.     **Foreign law hearing**

The Court then set the case for trial.  Avanzalia represented that it intended to present expert testimony regarding whether provisions of the Master Agreement and Undertaking violated Panamanian law.[1]  Dkt. 227 at 4–5.  This foreign law question

---

[1] As the Court understands it, the question of the agreements' claimed illegality is aimed at the "unjustifiable interference" element of Avanzalia's claim.  *See* Pl.'s Mem. of L. at 2 ("The illegality of this conduct renders Goldwind's actions unjustifiable . . ."); Def.'s Mem. of L. at 1 (discussing Avanzalia's argument as pertaining to Goldwind's intentional, unjustifiable interference with contract performance).

was not addressed in the administrative proceedings between Avanzalia and UEP I before ASEP.  *See* Dkt. 242, Ex. N, Defs.' Resp. to Pls.' RFA No. 2.  The parties agreed that, if the Court found the foreign law question relevant, it had to be determined by the Court rather than by a jury, and they proposed a hearing with foreign law experts.  *See* Dkt. 227 at 3.  On January 20 and 21, 2026, the Court heard two days of expert testimony.

Avanzalia presented one expert, Arturo Hoyos, a former chief justice of Panama's highest court, the Supreme Court of Panama.  Dr. Hoyos served on the third panel of the third section of the court, which primarily hears administrative and contract cases and has jurisdiction over ASEP.  Jan. 20, 2026 Tr. at 5:14–17, 23–25, 6:1.

The experts (and in particular, Dr. Hoyos) testified against the backdrop of several provisions of Panamanian law that establish a principle of free access to electricity transmission and distribution networks:

- "<u>Free access.</u>  Market agents shall have access to transmission networks under non-discriminatory conditions, subject to compliance with the regulations governing the service and payment of the corresponding fees." Law 6 of 1997, art. 70.

- "<u>Free access to distribution networks</u>.  The distributors shall allow non-discriminatory access to their networks to any large customer or generator that requests so, under the same conditions of reliability, quality and continuity established in the concession contract, upon request and compliance with the technical standards governing the service and payment of the corresponding fees."  *Id.*, art. 80.

- "Free access" is defined as "[t]he regime under which the company responsible for the operation of the national transmission network allows non-discriminatory access, connection and use of the transmission or distribution network to market agents who so request, subject only to compliance with the operating rules governing such service and payment of the corresponding economic compensation."  *Id.*, art. 6(1).

- "Market participants requiring connection to the National Interconnected System may build, at their own expense, any transmission facilities necessary for their connection.  Such facilities shall be for the exclusive use of the market agent that built them until another market agent requires their use.  The owner may not deny use to other market agents if there is remaining capacity according to the design and operation criteria established in the Operating Regulations."[2]  Executive Decree 22 of 1998, art. 47.

- "Any User of the Transmission System or new Provider of the Public Transmission Service that has access or interconnects, as the case may be, to the transmission network through third party facilities, shall request access or interconnection to the transmission system and may connect if there is remaining capacity.  Once the new access or interconnection is approved, it will have the same rights as the owner of the facilities regarding transmission."  Transmission Regs., art. 33.

Dr. Hoyos concluded that section 7.2 of the Master Agreement and section 2.3 of the Undertaking violated the free access principle.  He stated that section 7.2 of the Master Agreement violated the free access principle because "it is restricting access to third parties to [the] national grid" and reserving "access to the grid for themselves" for Phase II of the project.  Jan. 20, 2026 Tr. at 17:10–11, 19.  As for section 2.3 of the Undertaking, Dr. Hoyos stated that "[i]t's illegal" and "[t]o the extent that the parties undertake the obligations to no[t] grant[] . . . interconnection rights to third parties or to market agents, it's clearly illegal."  *Id.* at 18:14–17.  Dr. Hoyos did not examine the intention of the parties because he concluded that the provisions of the contracts were clear, and under Panamanian law, when a provision is clear, "the literal meaning of its

---

[2] The Operating Regulations are "principles, criteria and procedures established to carry out the planning, coordination and execution of the integrated operation of the national interconnected system and to compensate for energy exchanges between market agents."  Law 6 of 1997, art. 6.  The parties did not present expert testimony regarding the Operating Regulations as a legal matter or how they may have impacted Avanzalia's ability to connect to the grid when it initially sought access.

provision shall prevail." *Id.* at 46:17–18.

Goldwind presented two experts, Dennis Moreno, a technical expert, and Selva Quintero, a legal expert. Moreno is an electromechanical engineer who for several years was the general administrator of ASEP, a role similar to CEO. Jan. 21, 2026 Tr. at 77:6. Moreno visited the El Coco Substation. *Id.* at 78:17. He testified that by 2025, the substation had several bays: bay 5, which allowed the UEP wind farm to inject power into the national grid; bays 4 and 3, which allowed ETESA to deliver power to the national grid; and bay 2, which allowed Avanzalia to inject power into the national grid. *See id.* at 81:5–12, 83:10–12. Bay 5, he explained, could not be used by parties other than UEP without "removing all the conductors . . . , transformers, disconnecting switches from UEP installation, affecting the injection of power from wind farms[.]" *Id.* at 83:19–22.

Although he is not a lawyer, Moreno opined that UEP did not violate the free access principle of Panamanian law by refusing to allow Avanzalia to connect through bay 5, which was already occupied. This was so, Moreno testified, because UEP left space for other parties to build two additional bays and connect to the grid. *Id.* at 85:3–7. Avanzalia ultimately connected by constructing bay 2, and space remains for another party to build bay 1.

Goldwind's second expert, Selva Quintero, is a partner at the Panamanian law firm Galindo, Arias & Lopez. *Id.* at 113:20. She focuses on electrical law and represented UEP I in the ASEP arbitration with Avanzalia. *Id.* at 114:5, 116:17–18. Quintero agreed with Dr. Hoyos's interpretations of Panamanian law but applied both the free access and contract interpretation principles differently. Quintero asserted

8

that it would not violate the free access principle for parties to agree to develop a wind farm in Panama, obtain a license for certain megawattage, and agree not to "transfer to anyone else any of the already licensed megawattage[.]" *Id.* at 117:19–20. She also opined that it would not violate free access law for parties having rights to connect to a substation to agree not to grant others the right to connect if that would prevent one of the existing parties from accessing the grid. *Id.* at 118:11–16. Quintero concluded that both section 2.3 of the Undertaking and section 7.2 of the Master Agreement complied with Panamanian law. *Id.* at 130:22–24. She applied Panamanian contract law, which permits examining other provisions of a contract to discern the intent of the parties if the relevant provision is unclear, and opined that the parties intended to comply with the law. *Id.* at 122:17–19.

**Discussion**

Federal Rule of Civil Procedure 44.1 governs the Court's consideration of foreign law. After a party expresses intent to "raise an issue about a foreign country's law[,]" the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination [of foreign law] must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1. *See generally Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 42 (2018) (explaining that Rule 44.1 marked a shift because foreign law determinations were historically considered rulings on questions of fact).

Panama "is a Civil Law jurisdiction." Patrick Tinsley, 3 Digest of Commercial Laws of the World § 40:1. "[I]ts main bodies of law follow the general model of the

9

Napoleonic (Continental or Civil) laws[.]"[3]  *Id.*  The legislature enacts Codes, "which are systematic codifications of provisions dealing with a specific subject matter."  *Id.* § 40:3.  Other sources of law include "laws" enacted by the legislative branch and "'law decrees' [] passed by the [e]xecutive [b]ranch invoking constitutional grants by the legislature of special legislation powers."  *Id.*

The Panamanian Civil Code codifies principles of contract interpretation. "If the terms of a contract are clear and leave no doubt about the intention of the contracting parties, the literal meaning of its provisions shall prevail."  Civ. Code of Pan., art. 1132.  If the words of a contract contradict the "evident intent of the contracting parties, the intention shall prevail over the words."  *Id.*  The intent of the contracting parties is assessed through their actions "both contemporaneous with and subsequent to the contract."  *Id.*, art. 1133.

Contract terms should be "interpreted in relation to one another, attributing to the doubtful terms the meaning that results from the whole."  *Id.*, art. 1136. Ambiguous terms should be interpreted "in the most appropriate sense to produce effect," *id.*, art. 1135, and "in the sense that is most in accordance with the nature and purpose of the contract."  *Id.*, art. 1137; *see also Inversa, S.A. v. United States*, No. 01-220C, 2006 WL 5625618, at *5  (Fed. Cl. July 21, 2006) (summarizing the "three

---

[3] Panama declared independence from Columbia in 1903.  Tinsley, 3 Digest of Commercial Laws § 40:1.  "The Panama code is, consequently, substantially identical with that of Colombia, and like the latter is Spanish in origin and development, being based upon the Roman law."  *The Civil Code of the Republic of Panama, and Amendatory Laws, Continued in Force in the Canal Zone, Isthmus of Panama, by Executive Order of May 9, 1904*, 19 Harv. L. Rev. 76, 76 (1905).  As of today, parts of the Panamanian legal system have been influenced by the common law of the United States.  *See* Tinsley, 3 Digest of Commercial Laws § 40:1.

basic rules of contract interpretation" under Panamanian law).  Additionally, contract provisions may not be "contrary to the law, morality or public order."  Civ. Code of Pan., art. 1106.  "[I]n a positive sense[,]" public order is defined as the "public interest."  Law of Aug. 2, 2000, art. 201 ¶ 70.

Turning back to the principles of free access quoted in the prior section, the Court emphasizes Article 47 of Executive Decree 22 of 1998:  a substation owner "may not deny use to other market agents *if* there is remaining capacity according to the design and operation criteria established in the Operating Regulations."  Executive Decree 22 of 1998, art. 47 (emphasis added).  Articles 70 and 80 from Law 6 of 1997, which define free access, do not reference at all whether the substation has any remaining capacity.  Read in isolation, Articles 70 and 80 of Law 6 of 1997 would require substation owners to provide access to other parties even if there is no remaining capacity, presumably at the expense of their own access.  Reading Articles 70 and 80 this way would render Article 47 a nullity.  The Court therefore reads all these provisions together and thus construes Articles 70 and 80 to include the capacity condition found in Article 47.  The capacity condition permits a substation owner to deny access to a market agent if no capacity remains "according to the design and operation criteria established in the Operating Regulations."  Executive Decree 22 of 1998, art. 47.

Having construed the relevant provisions of Law 6 and Executive Decree 22, the Court turns to the parties' arguments regarding legality of the contractual provisions at issue.  Avanzalia argues that two provisions of the Master Agreement and the Undertaking violate the free access principle:  section 7.2 of the Master

11

Agreement and section 2.3 of the Undertaking.  The Court addresses each in turn.

Section 7 of the Master Agreement is entitled "Shared Asset Agreement."

Master Agreement § 7.  Section 7.2 states in relevant part that

> the Company shall not grant access to the Substation and to the current right under the Interconnection Agreement (as defined in the Credit Agreement) to interconnect up to 281.8MW (ie. the remaining interconnection capacity after deducting the 55MW of Phase I from the 336.8 MW total interconnection capacity) to any other market agent (*Agente de Mercado Eléctrico*) to the extent that such access affects or may affect Phase II or the Remainder's capacity to connect to the energy grid and deliver its energy through the Shared Facilities.

*Id.* § 7.2.  Reduced to its substance, this term provides that "the Company"—UEP I— shall not grant access to "the Substation" to any other market agent if doing so affects the capacity of the Agreement's parties to connect to the grid.  This provision includes several capitalized terms, which are references to express definitions found elsewhere in the Master Agreement.  Section 7.1 provides the definition of "Substation":  "the El Coco Substation (except for the facilities therein which are for the exclusive use of Phase I, Phase II or the Remainder, the 'Substation['])".  *Id.* § 7.1.  The "Shared Facilities" are a series of buildings, improvements on public roads, the El Coco Substation, and certain property.  *See id.*  Phase I "consists of the development of a wind farm with a nameplate capacity of 55 MW[,]" *id.* at 1; Phase II is the remaining "165 MW . . . of the 220 MW which comprise the Project[,]" *id.*; and the Remainder is "the remaining 116.5 MW of the original 336.5 MW design capacity[,]" *id.* § 7.2.

The Court concludes that Section 7.2 is consistent with Article 70 of Law 6 of 1997, which provides that "[m]arket agents shall have access to transmission networks under non-discriminatory conditions, subject to compliance with the regulations governing the service and payment of the corresponding fees."  Law 6 of

12

1997, art. 70.  Because, as the Court has ruled, Article 70 is read in conjunction with the capacity condition in Article 47, section 7.2 is lawful.  It prohibits access to the Substation only "to the extent that such access affects or may affect Phase II or the Remainder's capacity to connect to the energy grid[.]"  Master Agreement § 7.2. Whether "the Substation" refers to the El Coco Substation or to bay 5 alone, which the parties debate, is of no consequence, as Section 7.2 remains consistent with the free access principle in that it prevents other parties from connecting only to the extent this affects the capacity of the contracting parties.

Turning to section 2.3 of the Undertaking, that section also restricts connections by non-contracting parties:  "Subject to any existing lender security interests, none of the Parties nor the Facilities Company shall grant access to the El Coco Substation, and UEPI shall not transfer its Excess Rights other than as contemplated by Section 2.2 to any other than each owner of the Projects."  Undertaking § 2.3.  The Undertaking does not define the El Coco Substation, but Schedule 1, which is appended to the Undertaking, defines it as "the facility that currently interconnects the Phase I Project to the Panamanian Power Grid, and which shall be adjusted to increase its capacity so that it can safely interconnect all phases of the Master project . . . to such power grid."  *Id*., Schedule 1, Shared Assets ¶ 2.  As for the other terms in this provision, "the Parties" are the various UEP entities, and "the Facilities Company" is an independent company owned by the UEP entities "in proportion to the nameplate capacity of the respective Projects each owns to the aggregate nameplate capacity of the Projects[.]"  Undertaking at 2.  Section 2.2 defines UEPI's "Excess Rights," which are "interconnection rights and obligations in excess of those required for the Phase I

13

Project and rights and obligations under a road environmental impact study for the Projects as a whole that will need to be modified so that the Phase II Project can rely on it as well[.]"  Undertaking § 2.2.

Under section 2.3 of the Undertaking—in contrast to section 7.2 of the Master Agreement—denial of access is not tied to the absence of additional capacity.  Rather, section 2.3 of the Undertaking simply states that no contracting party shall transfer interconnection rights other than to another contracting party.  The Court concludes that section 2.3 violates the free access principle by requiring the parties to deny requests to connect to the Substation irrespective of whether capacity remains for their own projects.  Impact on the parties' capacity would be the only valid basis for such a denial.

Goldwind contends that the term "El Coco Substation" in section 2.3 refers to bay 5 and that free access law permitted the contracting parties to reserve access to bay 5 for the UEP entities, who were already connected to this single-use bay. According to Goldwind's technical expert Moreno, bay 5 could only be used by one party and was already configured to connect the UEP projects to the grid.  For its part, Avanzalia contends that the term "El Coco Substation" refers to the El Coco Substation as a whole, rendering section 2.3 an illegal prohibition on granting third parties access to the substation in violation of the free access principle.

The Court finds section 2.3 ambiguous on this point.  The definition of El Coco Substation imported from Schedule 1 does not clarify whether section 2.3 refers to El Coco Substation as a whole or bay 5 alone.  Either is possible.

The Court may look beyond section 2.3 to resolve this ambiguity.  In the

14

Undertaking, other provisions refer to the "[ETESA] Portion of the El Coco Substation, which is required by law to be transferred to ETESA when required by ETESA[,]" Undertaking § 1.6, and to "the portion of the El Coco Substation not transferred to ETESA." *Id.* § 3.2. Based on Moreno's testimony that ETESA employed bays 3 and 4 to connect the Substation to the national grid, the Court understands the "ETESA Portion" to refer to bays 3 and 4. In other words, when the parties intended to refer to something other than the full substation, they did so expressly. Here, however, there is no such limitation. The Court therefore reads the term "El Coco Substation" in section 2.3 to reference the full substation, not only bay 5. This is also the natural reading of the term "El Coco Substation." With this definition, section 2.3 of the Undertaking prohibits the contracting parties from granting third parties access to the El Coco Substation, period. This violates the free access principle because the prohibition has no qualification regarding capacity.

Goldwind makes several other arguments to support its reading. First, it asserts that section 2.3 merely ensured that none of the contracting parties could transfer their licensed megawattage or unilaterally give another market agent the ability to connect to El Coco Substation. That would be consistent with the free access principle, but that is not what section 2.3 says: it reaches more broadly to state that "none of the Parties nor the Facilities Company shall grant access to the El Coco Substation[.]" Undertaking § 2.3. Goldwind's reading is not supported by the plain language of the provision.

Second, Goldwind disavows "a desire to improperly hoard regulatory authority[,]" Def.'s Mem. of L. at 3, or "a pointless attempt to usurp regulatory power

15

when all access requests and access disputes necessarily and automatically involve the regulators." *Id.* at 1. It says that the contracting parties intended to comply with the regulatory authority of ETESA and ASEP and grant access when required by those bodies. But entering into a contract in violation of the free access principle could still run afoul of the law. Article 33 of the Transmission Regulations clearly states that private parties who operate transmission facilities must comply with the free access principle. A private party can violate the free access principle without intending to replace or undermine government regulators.

Goldwind similarly contends that because the contracting parties expressed their intent to comply with "applicable Law, leasehold, regulatory, engineering, and lender requirements," Undertaking § 5.5, section 2.3 does not violate the free access principle. This is not a viable argument. Although Panamanian contract interpretation at times rests on the parties' intent, *see* Civ. Code of Pan., arts. 1132–33, it would make no sense to allow parties to render an otherwise illegal contract legal simply by asserting their intent to follow the law. If Goldwind were correct, *any* contract, no matter how obvious its illegality, would effectively be immunized simply by including this language.

Although the Court agrees with Avanzalia in holding that section 2.3 of the Undertaking violates the free access principle, factual questions remain requiring the presentation of evidence to the jury. The illegality of the provision may support an aspect of the third element of the tortious interference with contract claim, which requires Avanzalia to prove that Goldwind intentionally and *unjustifiably* prevented it from performing a contract. *See Scholwin*, 147 Ill. App. 3d at 607–09, 498 N.E.2d at

16

255–26.  Use of an illegal contractual provision likely would satisfy the unjustifiability aspect of this element.  But there's more to the third element than that (as read together with element 4); it requires intentional conduct by Goldwind and *use* of the illegal agreement to prevent Avanzalia from performing a contract, as well as causation of damage to Avanzalia.  Thus, by itself, the simple violation of the free access principle found in the Undertaking does not carry the day.  As Dr. Hoyos testified, "*[t]o the extent* that the parties undertake the obligations to no[t] grant[] . . . interconnection rights to third parties or to market agents, it's clearly illegal."  Jan. 20, 2026 Tr. at 18:15–17 (emphasis added); *id.* at 23:4 ("It'll be a question of fact, Mr. Blonder, really.").

## Conclusion

To the extent that Goldwind took actions based on section 2.3 of the Undertaking to limit Avanzalia's access to the El Coco Substation, those actions would violate the free access principle embodied in Panamanian law.  The jury must, of course, determine whether Goldwind took such actions and whether Avanzalia can establish all the elements of its tortious interference claim.  The Court denies Goldwind's motion in limine number seven [dkt. 233] in part; Avanzalia may refer to section 2.3 of the Undertaking as an "illegal agreement."  The parties are directed to confer regarding a jury instruction embodying the Court's ruling and are to provide proposed instruction (or alternative proposals if they cannot agree) by March 19, 2026.

Date:  March 17, 2026

_____
MATTHEW F. KENNELLY
United States District Judge

17